2-14-0903 for the state of Illinois, located in Catalina, to the Hennessey defendant's account. I would like to welcome the defendant to the count, Mr. Donald J. Ramsell. Pardon me, Your Honor, Mr. Ramsell? Thank you. Good morning, Your Honors, and may it please the Court, my name is Donald Ramsell. I represent Mr. Garcia in this case. Essentially, it's a DUI case. The defendant was charged with two basic types of DUI. One was being under the influence of alcohol. He was found not guilty of that. The other was driving with a VAC or brought the alcohol concentration of 0.08 or more. He was found guilty of that. The two essential issues here, to boil them down, one deals with whether or not the officer's testimony regarding whether the defendant was in a rising alcohol concentration at the time of driving was erroneously excluded. The second deals with the breathalyzer records and their admission, which we challenge on the basis that they were erroneously admitted. Did you seek to have the officer testify as an expert or as a lay witness? I don't believe there are such terms anymore. I sought to have him testify on an opinion that he had specialized knowledge on, which was above that of a lay person, and that would fall under the auspices of Rule 702. The choice of the term expert, I think, is no longer acceptable, in my opinion, respectfully. So I offered him as an opinion witness on cross-examination. Well, there is a great foundation laid, though, for his opinion, adequate for the admission of his opinion, correct? That is the heart of the issue on that. I certainly agree with your Honor there. That's the focus. It's our position that after he was qualified as a trained breathalyzer operator, and his specialized knowledge was revealed in the States case, and that in cross, he indicated that he did have knowledge on the subject of a rising BAC. And let me just offer that, frankly, I don't want to take this posture as the whole ball of wax, but most people understand the idea that it takes a while for alcohol to be fully absorbed into the bloodstream. But he has specialized knowledge on that. I'm not going to say he's a toxicologist. It's the State's position that only toxicologists can testify to that. It's our position that anyone with above layperson knowledge has the ability to offer that, and it goes only to wait. Do you need above layperson knowledge for that, though? I mean, you just said we all kind of realize that you don't take a drink and then your blood alcohol goes to a level, and we all kind of, isn't it kind of common knowledge that it goes up and down with time? Well, Your Honor, I have to look in the rearview mirror about all the rest of my clients, and I'm not ready to open the door that everybody's going to be able to take the stand and say up or down. No, but I mean, you have evidence here of a time period where you had a .107. You have a time period where you have a little bit later, a little later, a .12. I mean, so it doesn't take a rocket scientist to figure out that it's here at .107 and it's up at .12. I agree. Can't you still argue that? It does not take a rocket scientist. That's why Judge McGenesee is wrong. He wanted a rocket scientist. What I'm saying is, I guess I'm getting more to a harmless error situation. Can't you argue it anyway? Judge, could I argue it? Yes. But could I argue it less effectively? Yes, because I lost a witness. I lost evidence I'm entitled to. And under the U.S. Supreme Court cases that I cited, relevant and material evidence that would lessen the strength of the state's case, I'm entitled to put in. And we can't shave it down, that because that error, I still was able to argue. I was able to argue less effectively with less evidence in the record. It wasn't cumulative because there was no other evidence offered other than for me to ask the trier of fact to extrapolate on his own, rather than offer a legitimate basis, because that trier of fact could say, there's nothing in the record for me to wish to extrapolate, versus there's evidence here you cannot ignore. You make the argument at one point that since the state is able to rely on circumstantial evidence of intoxication and so forth, that the defendant should also be allowed. What circumstantial evidence do you feel you should have been allowed to argue but you weren't? I would say they get circumstantial evidence. I should have had that opinion evidence. Tell me what the circumstantial evidence would have been. The opinion evidence. Just that. Yes. Now, interestingly, I found this, I don't even know how to fathom the right words, how my use of the PBT and orderly foundation for this opinion evidence was insufficient for this witness to be allowed to opine on the record. But then the judge used the two results to find the defendant was likely to have been .08 or more at the time of driving. He took what I used for foundation and did not let my witness testify to it, but independently in his findings said it's good enough for me to go the opposite direction. All right. The evidence indicates that on cross-examination you questioned Officer Rowe and he said he had his training encompassed operating the instrument and the physiology and pharmacology of alcohol in the human body. What specifically did he say? Oh, I wish I had a great memory to that degree. Was it more specific than that? It may have been, but I don't think it was tremendously more specific because the state's objections weren't specific that that was insufficient. They point out somewhere, I mean, there's so much argument of waiver and forfeiture in these briefs, it's like a legal whack-a-mole to keep up with it all, but I would point out there was testimony, they had knowledge on the areas of physiology and pharmacology. The judge's ruling essentially was clear as a bell. Unless this gentleman was a toxicologist, he wasn't going to get to testify. It rendered all my attempts, because I continued to go further and further, foolhardy. I was never going to get to the point where he was a toxicologist. Even if you tried to put him on before the judge said he better be a toxicologist, there were some things that you needed to establish. Weren't there, like, what he knew about this person, about your clients, what he ate, how long ago he was drinking, the length of time he was drinking, things like that? Those are all part of what an opinion witness would have to testify to, and I direct you to Floyd where we made that decision. Yes, I'm very familiar with Justice McLaren's opinion there. Excuse me, I don't think it's his opinion. It is, but it's mine. Yes, I apologize. No problem. And what I recall from that was that in the absence of two tests, those factual elements would be much more important. I certainly didn't say with two tests they're all unnecessary. No. But I did say some of that may no longer be as important if there's two tests. But I agree those factors are very important for cross-examination, certainly. And it would be part of his qualification if that's what you were attempting to do, correct? Yes. Because in Floyd, that's where it fell apart. Correct. Do you know how much he ate? Yes. Not really. Do you know when she started drinking? Not really. Correct. Those are all issues that have to be determined when you try to do a retrograde extrapolation, correct? They are extremely helpful, and in the absence of two tests, absolutely crucial. I'm certain your opinion does say it literally is crucial. These elements have to be plugged in when there are not two tests. When there are two tests, they become less crucial. I'm not saying they're not necessary. They're always very helpful in that arena. But the State did not object that these were the basis for their lack of foundation argument. Therefore, Your Honor, it could be right on the science. I certainly don't dispute that. I have some knowledge in that area. But they did not object on that foundation. So I don't believe the court could say, well, you missed all these other things you should have done. If they didn't object, I don't think I had to. So I can't tell you what the witness's answers would be. But he said that he had training where he could do this based on what he had been told and learned in his training. Now, I would like to go to the other element, though, the document itself. People's Exhibit 1, the breathalyzer records. Now, I think the court should be extremely troubled for the following. There were three sets of accuracy checks done on March 7th of 2012. But People's Exhibit 3, which they admitted, shows only one of them. For March 7th of 2012, there were three sets of two tests per set. But only one set of two tests shows up on this document. That renders this untrustworthy and unreliable and incomplete. That's step one. Forget about all the other foundation. And what was that law book admitted for? To show the untrustworthiness of this computer-generated document. If I were to be in another case and show that an accountant was keeping two sets of books, two sets of books, one with three deposits of separate amounts and one with one deposit, and I attempted to admit the second set of books as trustworthy, would it be impeached by that second set of books that shows different entries? Of course. Of course it would. I don't think I have to attribute a malicious motive. But this document's been cleansed. This was admitted initially by the court on the basis that there was a certification. I dispute that word in this case, by the way. That said that, by Nancy, that said, I certified the attached accuracy records, serial number 08417, dated March 7th and April 1, 2012, are true and accurate copies. They're not. They're not. There's four more accuracy checks. The company which are two sets missing from that exhibit. Now, let's talk about that exhibit. IntoxNet. Now, I get it. The State wants to argue there's some kind of waiver or whatever because I'm not even sure what their argument is. In their reply brief, they suggest there's a waiver because I didn't raise the idea that IntoxNet is a private corporation. But heading B of my original brief reads, the affidavit in this matter did not satisfy the requisite foundation for computer-generated records from a private corporation software program. I didn't waive anything. It's right here. Or was it raised at trial? Yes. And that's the other interesting thing. And I'm glad that you brought that up, Your Honor, because I looked at their own brief. But I can't find it right now. But I am certain that I brought that up in my responses. I filed originally on this case, the State sought to admit this pretrial. I filed a response to it. I don't know what to so I apologize. I wish I could cite two particular pages. But I don't think it's hard for the Court to understand that this IntoxNet is not a seal of a public agency. I mean, do I really have to go that far to ask you to understand that Snickers, a Snickers bar is not made by a public agency? I think that's an issue. You objected to certification, improper certification, I believe, early on. The question I have is whether you objected specifically to the lack of foundation for a computer-generated record. That was my question. A computer-generated record? Right. Lack of foundation for a computer-generated record. I wish I had that kind of memory, Judge. I'm going to assume I did, but I'm not willing to answer because I just don't remember anymore. This case has gone on for a long time. I'll just let the record speak for itself. I will suggest, Your Honor, Your Honor's allowed the government to even file a third reply. And if there is waiver, I did allege plain error just simply because. And they had a third reply, so I think we've briefed the heck out of every issue here to that extent. I don't think it's really that hard to look at it. If the court feels like they get away with using private records of a corporation simply because they slapped a seal on it and that's just too hard to make an exception to the waiver or plain error, I would say, Your Honor, it's a very simple argument. This does not require – there's no great prejudice on the part of the government. It's in ToxNet. There's a trademark. Who's kidding who? What else can they do to brief them than what they've done in this case? Did IntoxNet do the accuracy checks? Yes. Well, excuse me. I will offer this. The machine is plugged in, and you can look at the rules. The machine's plugged in to a motor. There's a cloud that's controlled by IntoxNet, which is a private company. Intoximeter's out of St. Louis, Missouri. No human being on the part of the government did anything with that second accuracy check. Cooper Rodriguez didn't do anything? He did with the March 7th one, but he did nothing with the April 1st one. If I could just have 30 seconds. That's fine. Thank you. In terms of precedent, all these other cases, prior to these automated accuracy checks, there was always a human being that signed the seal, signed the book. Someone put their name down from the government to say, I did it, and I find it accurate. Now we have a cloud from out-of-state government, a nongovernment agency doing it, and I'd submit we should demand a little more in that regard. Thank you. Ms. Rabulinski? Good morning, Justices. May it please the Court, Alyssa Rabulinski arguing on behalf of the people of the State of Illinois. Your Honors, I think first and foremost, one of the most key portions to this case is that at the end of the day, the best evidence in this case is that within minutes of the defendant driving a motor vehicle, his breath alcohol content was .107. That was from the portable breath test that was admitted by the defendant that was taken on the road within minutes of the defendant driving. In addition to it being a .107, that is an under-butted result of the defendant's breath alcohol content admitted into evidence with no issues in terms of the veracity or the reliability of that result. I think... That was admitted by defense counsel in an effort to lay a foundation for his opinion witness that the defendant's breath alcohol level was on the rise. Correct, nevertheless. So is it a fairness issue, Mr. Counsel, in the case that we're going to use that evidence to convict the defendant but we're not going to let, we're not going to use that evidence or allow it in to show that the breath alcohol was on the rise? In terms of that, Judge Magimsi, as you can tell from the record at 1.30, Judge Magimsi did say that he would allow that in and obviously that Mr. Ramsell could argue that there was a difference between the first and second results. Obviously that's something that goes to the weights of the veracity of the second breath test and so in terms of that, I don't believe that there's an issue as to fairness. Additionally, that breath result of .107, the defendant, that is his choice to put that into the record and that's his choice solely, the people are not allowed to, and so obviously that was his trial strategy and in terms of that, there isn't an issue that the people were allowed to use that because at the end of the day it was his choice to use it and it was entered into evidence. But he wanted to explain why it was important and he wasn't allowed to do that. This is, I believe, a question or concern here. Why is it this 13 minutes after driving and now another 40 or 50 minutes go by or 20 or 25 depending upon whose clock you're looking at, does it go up again? He wants the drier effect to understand the reason. Correct, and I believe, as I said earlier from the record, you could tell that Judge Magimsi clearly was contemplating and gave some weight in terms of the difference between the .107 and the .2. But I think it's important to look at when an individual is attempting to attack a breath test in terms of whether a breath alcohol content is rising or falling. Your Honors have been quite clear. Floyd from this district is quite clear that if you want to challenge in terms of whether a breath alcohol content is rising or falling to extrapolate it, that there is an enormous amount of foundation that must be laid by a witness that has particular knowledge and expertise in the area of rising and falling breath alcohol contents. Well, what did Officer Rowe learn about the physiology and pharmacology of alcohol on the body? What does he learn? Well, that's a good question. We would know that if those questions had been asked at the trial court. In terms of the foundation that counsel attempted to lay with Officer Rowe, it really was not, as you can tell from the record, there wasn't really that many questions in terms of specifically what that officer has learned in terms of the effects of alcohol on particular individuals, just that he's had merely some training and that he somehow understands that breath alcohol contents can rise or fall. But in terms of how it specifically affects an individual, there's no evidence of that that Officer Rowe has expertise in that. And further, there is obviously other factors that have to be taken into consideration, such as when an individual last consumed alcohol, what type of alcohol, if they had consumed any food, how much weight the individual weighed, how tall they were. But obviously none of that was contemplated, and none of those questions were even asked of the officer. Well, they weren't asked, and that was sort of the purpose of my question. At what point did the state object? Was the foundation complete as it was perceived, or were there other questions that counsel wanted to ask but the objection was already made and the judge made a decision? In terms of the people had objected on multiple occasions, and the court allowed the defense to continue to ask further questions in an attempt to lay foundation. And at the very end, when the officer had just testified that he was aware that breath alcohol contents rise and fall, and that he has had some training in how alcohol affects individuals, the people had objected again. And at that point, that's when Judge Magimsi stated that he did not believe that the requisite foundation had been met. And at that point, counsel hadn't asked for further opportunities to continue to question the officer because I believe, and I believe the record shows, that there really wasn't going to be anything else that could be borne out from this officer.  And the court later cited with authority a Texas case that said an expert could potentially create a reliable estimate of the defendant's PBC with limited knowledge of these characteristics and behaviors if you have more than one test. And here we have more than one test. Correct. There is more than one test, but, however, I still believe that the judge I believe that your honors were correct in your floor because in this situation, the two tests that were taken, not only they were taken very closely in time, within 30 minutes, but as I said earlier, just because this officer had an ability to look at two tests, he still isn't an individual who is qualified to give some sort of opinion as to whether an individual's breath alcohol content is rising or falling. Obviously, a court can take notice and give weight to the fact that, okay, yes, we see the breath alcohol content was .107 within approximately 13 minutes of driving and then within 48 minutes of driving it was a .12. That is an argument that is able to be made by defense counsel, and the court allowed that argument. I believe it goes more to the weight because in this situation, Officer Rowe just simply was not qualified enough to make an official opinion  and to extrapolate what his exact breath alcohol content was specifically when the defendant was driving. And I think it's also important to look at. There's case law in the state of Illinois, specifically a capice enforced that speak that the breath alcohol content that was taken back at the station, that the courts in this state give weight to what the breath alcohol content was back at the police station. And I think that's important because that progeny of cases has been continuing to be upheld. So I think even if you look at just what the breath alcohol content was back at the station, that that was absolutely sufficient to find the defendant guilty of driving under the influence of alcohol .08 or more. Did the defendant in this case ever try to actually establish an actual BAC when driving? The defense did not. There was no awful proof of that, correct? Correct. You're correct. All right. So if we're talking about a record rate extrapolation to an actual point, an actual number, that may be a little different than just to say it's rising or it's falling. Correct. And I still think that in this situation, Judge Magincy didn't not allow counsel to make that argument. And like I said earlier, he actually welcomed that argument. You can tell that through the transcript. That is still an argument the defense was permitted to make. Is this argument less effective? Yeah, he basically is just saying the way I look at the evidence, Judge, is it's rising as opposed to here's someone with training and experience who's been doing this for a long time and he says that it's rising. Isn't that less effective? I believe that it's effective even just being able to argue that it's rising because just because an officer who is no more qualified than just about anyone else and what the foundation was laid in terms of his testimony of what his training is, I don't think that there's a difference. Just because the officer who's not qualified as an expert, who's actually technically a lay witness, says yes, it's rising, I don't think that's any different than counsel arguing to the court that it's rising. Your Honors, in terms of I want to set something straight, counsel earlier spoke about how specifically the ECIR machine works and how the intoxicator received those records. I want to make it very clear, none of that is in the record. What counsel just said before, Your Honors, today is nowhere in the record here and to quite frankly should be in the record. Including the three sets of two tests that counsel spoke of? That, I believe also that argument technically was waived. As you can tell that in this case you need to make that argument during trial, in your post-trial motion, and counsel quite frankly did not do that. And so in terms of that issue of the difference between the tests taken that were on the intox report and what the logbook showed you, quite frankly, that argument is waived and looked at under plain air. And in this situation, the evidence is not closely balanced in this case. Your Honors, even if you didn't find that the people laid sufficient foundation with the intox reports, we still have a breath alcohol content of .107 within minutes of driving and the logbook pages substantially complied with the Illinois Administrative Code and were admitted into evidence to certify that the breath machine was accurate, which showed that the defendant's breath alcohol was .120. And so I believe, Your Honors, like I said in my brief and just now that that argument specifically was waived. What about the fact that we had no one's name on this April 1, 2012 certification? Was it an operator name for the March 7th? Your Honor, are you specifically looking at- I'm looking at the accuracy report that was admitted as people's- one thing says people's exhibit 3, page 2, and the other says people's exhibit 1, so I don't know what it is, but- Correct. It says Trooper Rodriguez's operator name for the certification check on March 7th. You can have a certification on April 1, but nobody's name there. Correct, Judge. In terms of that, the in-tax report, as you can see, which was certified- Trooper Rodriguez in the logbook pages, as you can see from people's exhibit number 4, he was the one who certified it accurate. That was on March 7th, 2012. And in terms of any other sort of certification, Your Honors, that, once again, was not an issue that was fully raised in the trial court. And I don't believe it would be appropriate to- it was waived by the defendant in terms of looking at the veracity and reliability of the machine. And once again, as I said in my brief and in my certify brief, that was an issue that was waived. And that's an issue that if the- if counsel believed that there was some sort of issue in terms of the weight or reliability of that machine, obviously, defense counsel has the power of subpoena and could have had Trooper Rodriguez come in and there could have been additional questions. But in this case, he didn't do that. And in this case, the people laid sufficient foundation for those breadth results to come in. And so at that point, when the people laid sufficient foundation, there was a rebuttable presumption that they were accurate. And that's in the Illinois Administrative Code. And so at that point, Your Honors, I believe that was an issue that if defense counsel wished to look into to try and deem that these accuracy checks were improper or that the ECR machine was not working appropriately on March 11th and March 12th, 2012, that was something that he should have done at the trial court but has waived and now is arguing before Your Honors. Well, waiver is applicable to the parties and we often will go beyond that if there is an issue of justice or fairness. Correct. And if there are three tests and we only see one, what should we think? Your Honors, I believe that in this situation, when there is waiver, at the end of the day, it was harmless because in this situation, like I said earlier, there is more than enough proof that the defendant was above 0.08 while he was driving a motor vehicle. The test that is unrebutted and was entered into evidence within minutes of the defendant driving was a 0.107. And in terms of defense counsel's argument. You say it was unrebutted. How are we going to rebut it other than the machine being accurate? This is the poor breath test that was taken on the side of the road. It was the 0.107. You know, the one that was done at the time later. You said there is unrebuttable evidence that it was 0.12 something. How does that get rebutted other than the machine is working accurately? As I said earlier, at the trial court, if defense counsel had an issue, obviously there was a rebuttable presumption because the people laid the foundation appropriate to have the breath results admitted. If defense counsel had an issue with the difference between the logbook pages and the in-tax report, then that was something that, as I said earlier, he very well could have subpoenaed the trooper who did the certifications and brought them in to ask what the difference between why there is apparently three logbook entries and why the people only printed two of the accuracy checks out of the three that were done on that date. Well, who does he bring in on April 1st? Because we don't know. We don't have a name. In terms of that, Your Honors, the defense... The master chief? Who do we bring in? Who would he bring in? In terms of that, Your Honors, the individual who would last certify the machine accurate, personally, Trooper Rodriguez. And as you can see, Trooper Info, he could have brought that individual in. Go ahead. But as I stated earlier, at the end of the day, Justices, in this case, the best evidence was the evidence that the defendant was a .107 within minutes of driving a motor vehicle. And the people would ask that Your Honors affirm the convictions of the defendant. Thank you. Thank you. Mr. Lenzel? So look at, and I will, and the history here says that they, prior to March 28th, sought to admit to this exhibit with the cleansed or the single March 7th, 2012 test. On March 28th of 2014, a hearing was held before the judge, a pretrial hearing. Regarding that exhibit, my argument, which you would find at ROP 14, beginning there, says, there's another problem, I believe it's, we're talking about matters of discovery and procedure here. Why is a human being doing the work on March 7th, Trooper Rodriguez? And if he did the work, which is apparently what March 7th reflects, he didn't create his own piece of paper? How did that happen? Skipping ahead. But there is suddenly a human being that showed up on the 7th of March. So although it superficially seems like everything is good, that's not necessarily true. Because this record appears to be a gerrymandered record. And what do I mean by that? Let's go back again to the business record, which used to be called the shopkeeper's rule. As a business record, you would look at a shopkeeper's books, et cetera, et cetera, et cetera. And I know in the record, when we started the trial, I asked the court to adopt, allow me to adopt my arguments I had made at that pretrial motion as if they were all being renewed at that time. And that's the problem here, Judge. But let me say more. What does the word success mean? If you look at the Exhibit 3, there are a host of problems here with it that were not addressed in TORULA, which the Second District hit. What are the host of the problems here? Well, in TORULA, it was admitted as a business record. Here, the judge said it didn't qualify as a business record because there was never an oath or attestation taken under Rule 803-6. It was admitted as a public record under 803-8. TORULA did not deal with that. TORULA did not raise the objection that it was a matters observed by law enforcement personnel. TORULA did not raise the objection that it was a computer-generated record of a private corporation. In TORULA, the court said that there was language that the record was made at or near the time of the event. But look closely at this written document of Nancy Eason. Number one, she never says when the records were made. What is stated is, paragraph one, the accuracy checks were made at or near the time of the occurrence. When was the record of the accuracy check made? We do not know. The accuracy checks were made by regular conducted activity. Nothing in Nancy Eason's statement says that it was done by a public agency. Nancy Eason's a lawyer. She says, look her up. And I say that because this is a cleverly worded cover page. It never tells us that it was a public record. It never says it's the record of the Illinois State Police. It says nothing that the record was ever generated by the Illinois State Police. It says nothing about how the record was created because the record belongs to a corporation in Missouri. And in a case which the court would find people versus Smith out of the first district, why did Smith not admit an accuracy check record there? Because it didn't say whether it passed or failed.  Nancy Eason's cover page never says that the document, that the test passed or failed. These are critical words. Judge McGypsy ruled that because the word success appears on the IntoxNet record, that he was going to interpret that to mean the result passed the rigors of the state police regulations. How do we know that? I mean, the state even admits. We have no idea what's going on. What is happening? You know, I print something out of my computer. If I type out 2 plus 2 equals 5, my printer says status success when it prints. That doesn't mean 2 plus 2 equals 5, nor does this mean that it passed or failed. There is a little more information on this sheet than just the word success. If the court could calculate it on a pure mathematical basis, I would agree one could do it itself. That's purely judicial notice, pure math. But there's something about environmental factors that is in the standard that we don't know how that plays through here, or whether it's been introduced into the algorithm that this company, Intoximeters in Missouri, is using. We do not know what the word success means. It is vague. And I would submit the court went out of its way. And then finally, Judge, if I may have 30 more seconds. Yes, sir. Williams v. Illinois. I'm not citing the president here, but an example. Out-of-court state corporation does a DNA test. Do you think if the government put a seal on it, it would be admissible in and of itself? No. They had to bring in somebody under 702 to explain it and why it was meaningful. Williams v. Illinois. This corporation, Intoximeter, and why was it admissible in Williams v. Illinois? Because it had accreditation. There were certifications. There was a whole host of regulations over that laboratory in Pennsylvania. But they didn't just slap a seal on it, and now it was admissible like it is here. And there was somebody to confront in court. This is a private corporation document that someone slapped a seal on. And if we're going to use it for breathalyzer cases, you'd have to be able to use it for DNA ballistics, fingerprints, and everywhere else. We'll just send everything out of state and have it managed by a private corporation, slap a public seal on it, and it becomes a public record. Thank you. All right, thank you, counsel, for your arguments. We will take a matter into advisement. We will issue a decision in due course. And we will now stand adjourned for the day.